526 So.2d 1332 (1988)
Stephanie CASEY, et al.
v.
SOUTHERN BAPTIST HOSPITAL, et al.
No. CA-8146.
Court of Appeal of Louisiana, Fourth Circuit.
May 12, 1988.
*1333 Gregory F. Gambel, Thomas B. Calvert, New Orleans, for plaintiffStephanie Casey.
William S. Penick, Bryan C. Misshore, Lemle, Kelleher, Kohlmeyer, Dennery, Hunley, Moss & Frilot, William W. Waring, Jr., New Orleans, for defendantSouthern Baptist Hosp.
William J. Guste, Jr., Atty. Gen., Warren E. Mouledoux, First Asst. Atty. Gen., Lois C. Davis, Asst. Atty. Gen., Dept. of Justice, New Orleans, for defendant-appellee State of La.
Before BARRY, ARMSTRONG and PLOTKIN, JJ.
BARRY, Judge.
This suit for damages is based on the alleged contraction of hepatitis from a blood transfusion. The issue is plaintiff's claim that La.Civil Code Art. 2322.1 and La.R.S. 9:2797 are unconstitutional therefore making strict liability applicable to these facts. After trial on the merits, the district court found no constitutional violation and dismissed plaintiff's suit. Plaintiff urges there are fatal infirmities due to the legislative procedures followed in the adoption of both provisions.
La.C.C. Art. 2322.1 provides:
Strict liability or liability of any kind without negligence shall not be applicable to physicians, hospitals, hospital blood banks, or nonprofit community blood banks in the screening, processing, transfusion, or medical use of human blood and blood components of any kind and the transplantation or medical use of any human organ, human tissue, or approved animal tissue which results in transmission of viral diseases undetectable by appropriate medical and scientific laboratory tests.
La.R.S. 9:2797 (as amended by Acts 1982, No. 204, § 1 and Acts 1987, No. 567, § 1), using almost identical language, now extends the coverage of Art. 2322.1 to dentists and to the transmission of infectious diseases.
Plaintiff argues that neither enactment met the germaneness and three reading requirements of Art. III, § 15(C) and (D) of the La. Constitution of 1974.
§ 15(C) provides:
(C) Germane Amendments. No bill shall be amended in either house to make a change not germane to the bill as introduced.
§ 15(D) provides:
(D) Three Readings. Each bill shall be read at least by title on three separate days in each house. No bill shall be considered for final passage unless a committee has held a public hearing and reported on the bill.
La.C.C. Art. 2322.1 began as House Bill 307. When introduced H.B. 307 provided as follows:
AN ACT
To amend and reenact Article 2317 of the Louisiana Civil Code, relative to liability for acts of others and of things in one's *1334 custody, to limit such liability to certain enumerated situations, and otherwise to provide with respect thereto.
Be it enacted by the Legislature of Louisiana:
Section 1. Article 2317 of the Louisiana Civil Code is hereby amended and reenacted to read as follows:
§Art. 2317. Acts of others and of things in custody.
Art. 2317. We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody. The provisions of this Article shall apply solely to those situations enumerated in Articles 2318 through 2322, and shall be understood with the modifications contained therein.
Section 2. If any provision or item of this Act or the application thereof is held invalid, such invalidity shall not affect other provisions, items, or applications of this Act which can be given effect without the invalid provisions, items, or applications, and to this end the provisions of this Act are hereby declared severable.
Section 3. All laws or parts of laws in conflict herewith are hereby repealed.
Essentially in that form, the bill was read by title twice in the House of Representatives, then referred to committee which reported the bill back to the full House with amendments that changed the entire bill as follows:
AN ACT
To amend the Louisiana Civil Code by adding thereto a new Article, to be designated as Article 2322.1, to provide limitations of liability for certain users of blood, organs, or tissue with respect to the transmission of viral diseases undetectable by appropriate tests, to provide for causes of action arising after the effective date of the Act, and otherwise to provide with respect thereto.
Be it enacted by the Legislature of Louisiana:
Section 1. Article 2322.1 of the Louisiana Civil Code is hereby enacted to read as follows:
Art. 2322.1. Users of blood, organs, or tissue; viral diseases.
Strict liability or liability of any kind without negligence shall not be applicable to physicians, hospitals, hospital blood banks, or nonprofit community blood banks in the screening, processing, transfusion, or medical use of human blood and blood components of any kind and the transplantation or medical use of any human organ, human tissue, or approved animal tissue which results in transmission of viral diseases undetectable by appropriate medical and scientific laboratory tests.
Section 2. If any provision or item of this Act or the application thereof is held invalid, such invalidity shall not affect other provisions, items, or applications of this Act which can be given effect without the invalid provisions, items, or applications, and to this end the provisions of this Act are hereby declared severable.
Section 3. All laws or parts of laws in conflict herewith are hereby repealed.
Section 4. The provisions of the Act shall apply only to those causes of action arising after the effective date of this Act.
In that context it was read by title once to the House before final passage. The bill was then sent to the Senate where it was read a sufficient number of times prior to its passage. See Acts 1981, No. 611 and relevant legislative history.
La.R.S. 9:2797 began as Senate Bill 694. As first introduced S.B. 694 provided as follows:
AN ACT
To amend Section 2793 of Title 9 of the Louisiana Revised Statutes of 1950, by adding thereto a new Subsection, to be designated as Subsection C, relative to immunity granted to a person gratuitously rendering care or aid at the scene of an emergency, to apply such immunity to a professional medical corporation and its insurer, and otherwise to provide with respect thereto.
Be it enacted by the Legislature of Louisiana:

*1335 Section 1. Subsection C of Section 2793 of Title 9 of the Louisiana Revised Statutes of 1950 is hereby enacted to read as follows:
§ 2793. Gratuitous service at scene of emergency; limitation on liability
* * * * * *
C. For the purpose of this Section the word "person" shall include a professional medical corporation chartered under the provisions of Chapter 9 of Title 12 of the Louisiana Revised Statutes of 1950, and the provisions of Subsection B of this Section shall not apply to such professional medical corporation or its medical malpractice insurer.
Section 2. This Act shall become effective upon signature by the governor or, if not signed by the governor, upon expiration of the time for bills to become law without signature by the governor, as provided by Article III, Section 18 of the Constitution of Louisiana.
Section 3. If any provision or item of this Act or the application thereof is held invalid, such invalidity shall not affect other provisions, items, or applications of this Act which can be given effect without the invalid provisions, items, or applications, and to this end the provisions of this Act are hereby declared severable.
Section 4. All laws or parts of laws in conflict herewith are hereby repealed.
Basically in that form, the bill was approved by the Senate and sent to the House. The bill was read in the House twice before it was amended. The amendment changed the entire bill as follows:
AN ACT
To amend Chapter 2 of Code Title V of Title 9 of the Louisiana Revised Statutes of 1950, by adding thereto a new Section, to be designated as Section 2797, relative to quasi offenses, to provide that strict liability or liability without negligence shall not be applicable to health care providers in the screening, processing, transfusion or medical use of human blood, and the transplantation or medical use of human tissues and human organs or animal tissue which results in the transmission of viral diseases undetectable by scientific methods, and otherwise to provide with respect thereto.
Be it enacted by the Legislature of Louisiana:
Section 1. Section 2797 of Title 9 of the Louisiana Revised Statutes of 1950 is hereby enacted to read as follows:
§ 2797. Users of blood, organs, or tissue; viral diseases
Strict liability or liability of any kind without negligence shall not be applicable to physicians, hospitals, hospital blood banks, or non-profit community blood banks in the screening, processing, transfusion, or medical use of human blood and blood components of any kind and the transplantation or medical use of any human organ, human tissue, or approved animal tissue which results in transmission of viral diseases undetectable by appropriate medical and scientific laboratory tests. The provisions of this Article are intended to be prospective in nature and shall not affect causes of action which have arisen prior to the effective date of this Article.
Section 2. This Act shall become effective upon signature by the governor or, if not signed by the governor, upon expiration of the time for bills to become law without signature by the governor, as provided by Article III, Section 18 of the Constitution of Louisiana.
Section 3. If any provision or item of this Act or the application thereof is held invalid, such invalidity shall not affect other provisions, items, or applications of this Act which can be given effect without the invalid provisions, items, or applications, and to this end the provisions of this Act are hereby declared severable.
Section 4. All laws or parts of laws in conflict herewith are hereby repealed.
The bill was then read in the House once, passed and sent back to the Senate for consideration of the changes. It was read once to the Senate before final passage. See Acts 1981, No. 331 and relevant legislative history.
Initially, both measures were read at least three times; however, the final *1336 adopted versions were not read three times. The issue is whether this renders the Acts unconstitutional.
The reading requirements are intended "to facilitate informed and meaningful deliberation on legislative proposals."
[G]ermane amendments to the text of a bill made at the stage of second or third reading are valid even though the amended version is not read three times on three days. On the other hand, if new provisions which are not germane to the text of the original bill are substituted after one or more readings, the new version of the bill cannot be validly enacted without the requisite readings following the substitution. (emphasis added) (footnotes omitted)
1 Sutherland, Statutory Construction, § 10.04, at 458 (4th Ed. 1985 Revision).
In A & M Pest Control Service, Inc. v. LaBurre, 247 La. 315, 170 So.2d 855 (1965) the Supreme Court discussed the definition of "germane". In that case the district court found an act unconstitutional because its body was broader than its title. The Supreme Court stated:
To determine whether matter is germane to the subject matter of the act or section sought to be amended inquiry should be made to determine whether the new matter could have been incorporated in the original act, in the first instance, under its title.
LaBurre, 170 So.2d at 858-9. Application of that definition to the amendments to Acts 1981, Nos. 611 and 331 compels a conclusion that "the new matter" could not have been incorporated in the original act under its title.
H.B. 307's title, as originally proposed, purports to amend Article 2317 by limiting liability for acts of others and of things in our custody. After the bill eventually passed it enacted Article 2322.1 to disallow the application of strict liability under any theory against certain health care providers for contraction of undetectable viral diseases through use of human blood, organs or tissue.
Likewise, S.B. 694's title, as originally proposed, purports to amend R.S. 9:2793 to extend immunity to a professional medical corporation and its insurer for gratuitously rendering emergency care. When the bill eventually passed it enacted R.S. 9:2797 to accomplish the same purpose as H.B. 307.[1] Both final versions are clearly not germane to the original titles, therefore, any reading prior to the amendments may not be counted.
We conclude La.C.C. Art. 2322.1 and La. R.S. 9:2797 are unconstitutional.
La.R.S. 9:2797 was amended and reenacted by Acts 1982, No. 204, § 1, effective July 15, 1982 and the constitutionality of that enactment has not been challenged. Thus, our finding of unconstitutionality, insofar as it relates to R.S. 9:2797, extends only until July 15, 1982. Even though C.C. Art. 2322.1 is unconstitutional, the almost identical provisions of R.S. 9:2797 would apply as of July 15, 1982.
In addition to the constitutional violations noted above, we point out Art. III, § 2(A) which provides in pertinent part:
No new matter intended to have the effect of law shall be introduced or received by either house after midnight of the fifteenth calendar day, except by a favorable record vote of two-thirds of the elected members of each house.
What occurred here is exactly what that constitutional provision is intended to prohibit, i.e., the gutting of bills in order to "introduce" new proposed legislation beyond the prescribed filing deadline.

LIABILITY
Since the record is complete we will consider the case on the merits. Gonzales v. Xerox Corp., 320 So.2d 163 (La.1975); Thomas v. Missouri Pacific R. Co., 466 So.2d 1280 (La.1985); Woods v. Cumis Ins. *1337 Soc., Inc., 364 So.2d 213 (La.App. 4th Cir. 1978).[2]
A distributor of blood is strictly liable in tort when blood he places on the market creates an unreasonable risk of harm to others and, in fact, results in injury or disease to a human being.
DeBattista v. Argonaut-Southwest Inc., Co., 403 So.2d 26 at 32 (La.1981); Shortess v. Touro Infirmary, 520 So.2d 389 (La. 1988).
Baptist urges that Weber v. Charity Hospital, 487 So.2d 148 (La.App. 4th Cir. 1986) and Shortess v. Touro Infirmary, 508 So.2d 938 (La.App. 4th Cir.1987) limit strict liability to a manufacturer of blood. Shortess was reversed on that issue. Shortess v. Touro Infirmary, 520 So.2d 389 (La.1988). Further, the Supreme Court in Shortess specifically overruled Weber on this issue.
Therefore, Baptist is liable for the hepatitis disease contracted by Stephanie Casey.

QUANTUM
Stephanie Casey, a nurse, had two blood transfusions following a cesearean section delivery of her second child. Stephanie testified that breastfeeding was very important to her because she believed it reduced allergies and other sicknesses. She claimed she was told that she could not breastfeed without the transfusions.
Dr. Lilly, a gastroenterologist, saw Stephanie about eight weeks after the transfusions (April 1982). He testified Stephanie complained of nausea and inability to eat. Her urine was brown, her skin and eyes turned yellow, and she felt tired. Tests for hepatitis revealed her SGOT was 1008 (upper normal is 41) and her SGPT was 729 (upper normal is 36) and her bilirubin was 2.82 (upper normal is 1.5). His testimony indicated that elevated enzyme levels (a more inflammatory reaction) coincide with a patient feeling bad. He diagnosed her condition as acute hepatitis, which later developed into chronic hepatitis.
Dr. Lilly further testified that in June 1982 Stephanie began serial lab studies and the levels went down to almost normal, then went even higher. At that time her SGOT was 1320 and her SGPT was 2060. Her bilirubin was normal. He put her in the hospital for a liver biopsy to rule out any other problem(s). While in the hospital her SGOT was 2300 and SGPT was 3900.
According to Dr. Lilly, a liver biopsy removes tissue from the liver for evaluation. The skin and liver are deadened and a suction-type 3 inch needle with a ball-point pen size bore is inserted into the liver. Stephanie described this procedure as painful.
According to Stephanie, she left the hospital after about two weeks, even though her enzyme levels were still elevated. During the day a nineteen year old girl took care of the baby and her 18 month old son. According to Byron Casey, Stephanie's husband, the sitter worked for $20.00 a day, five days a week for 44 weeks, and was paid $4,400.00.
In October 1982, after discussion with Dr. Lilly and Byron Casey, Stephanie began taking steroids. Dr. Lilly testified that her SGOT went down to 179 and SGPT to 267. In November the SGOT was 28 and SGPT was 55. However, even though the enzyme level almost became normal, she reported side effects from the steroids and started to feel bad. Stephanie testified this made her very depressed, her enzyme level went up, and she had to wean herself off the steroids. Dr. Luis Balart, an expert in hepatology and general medicine, testified by deposition introduced at trial that discontinuation of the steroids might cause depression. Stephanie testified that discontinuing the steroids was difficult.
Sometime in March 1983, after she had gotten off the steroids, her father-in-law, a physician, brought over a scapular and prayer book from Lourdes, indicating to her that her condition was incurable. Stephanie testified she was taken aback by the gesture and realized she could die.
*1338 Dr. Balart examined Stephanie in May and June 1986, and said that (according to her records and the history given) during the balance of 1983 her enzyme levels were variable but continuously elevated, ranging to about 400. In January 1984 the SGOT was 380 and SGPT was 480. In June 1984 both were about normal, but she still reported feeling tired. The hepatitis apparently became dormant sometime between June 1984 and April 1986.
Stephanie testified that she had to constantly rest during her illness which was difficult because of her 18 month old son and newborn. She did feel better after resting for awhile, but never normal. She functioned with the help of her family and the sitter, but felt as though she were having the first day of the flu only getting a little bit worse every day, rather than better.
When her enzymes were very elevated she was more contagious and exhibited the worst symptoms. That caused her to be anxious about being with her children. She could not kiss her children or engage in or have normal relations with her husband.
Byron Casey testified that their 18 month old son got colic and eczema because he could not breastfeed. There was a tremendous strain on the family during his wife's illness. His work suffered. He had been attending Tulane University night school, adding to the strain.
Both Stephanie and Byron were concerned about the hepatitis returning or causing future problems, about the advisability of having another child, and about the risk of infecting the family or a fetus. They wanted more children so risks in having another child were of concern throughout her illness.
Considering the seriousness and extended period of Stephanie's illness, the pain, mental anguish, and prolonged concern over recurrence during future years, an award of ONE HUNDRED FIFTY THOUSAND ($150,000) DOLLARS is adequate.
In addition, specific damages include Stephanie's three medical bills totalling $3,731.13 [stipulated] and the sitter expense of $4,400.
The total award is $158,131.13, plus legal interest from judicial demand, and all costs.
REVERSED; RENDERED.
NOTES
[1] S.B. 694 actually took effect on July 15, 1981, prior to H.B. 307's effective date of September 11, 1981.
[2] Judge Barry notes his belief that the initial appellate determination of facts denies plaintiffs' right to a trial by jury. See Gonzales v. Xerox, 320 So.2d at 166. (C.J. Dixon dissenting); Picou v. Ferrara, 483 So.2d 915, 918 fn. 4 (La.1986).